This is our second case of the morning, which is in re Julie M. For the appellate, Mr. Davidson. For the appellate, Mr. James Ryan Williams. You may proceed. Good morning. May it please the court, counsel. I am Matthew Davidson. I'm a staff attorney with Legal Advocacy Service, which is a division of the state of Illinois's Guardianship and Advocacy Commission. And we're here as counsel on appeals seeking reversal of the circuit court of Champaign County. On behalf of Ms. Julie M., with respect to her involuntary admission order entered in the mental health proceeding below. Before I dive right into Julie's instant issue before this court, I would suggest this case is best assessed or discussed against the backdrop of the recent state Supreme Court decision of Inmate Linda B. in 2017. That's mentioned a few times in our briefing. In that decision, the state Supreme Court came to terms with the fact that modern mental health care is part of a larger mosaic now. We're no longer kind of seeing people go to specific psychiatric units for mental health services. In today's modern age, people are seeking and receiving mental health care in emergency rooms, general hospital floors, long term care facilities. And the question in that case or one of the questions the court in that case was given that when, if at all, is the mental health code implicated when these nontraditional settings are seeing people administered with mental health care? And the state Supreme Court unequivocally emphasized function over form. That is, we don't really pay too much mind as to what's on the name of the hospital or what wing of the hospital you're on. If that facility has the capability and does in fact provide mental health services to a respondent, then for all intents and purposes, for that instant matter, that facility is a mental health facility as defined by the mental health code. That's important because it doesn't just change the jargon or the nomenclature. It actually affords the respondent and patient all sorts of rights and protections. But I do want to highlight, it doesn't just benefit the individual. It benefits the hospital, too, and the risk management. Because at that point, the treatment team can say, look, we have a medical issue on our floor, but there's a mental health component overlaid. Let's afford this person all the protections and timelines. That way, if there's ever any claim of false imprisonment or civil litigation brought later on, the hospital itself can also say, look, we follow the mental health code. So given Linda B's position on how these nontraditional facilities are now being considered mental health facilities and implicated by the code, the state Supreme Court, almost in that same breath, acknowledged that in the very near future, given that holdings, there will be a case of a respondent at a general hospital treated perhaps involuntarily and without regard to the mental health code. And with that context, I do want to turn to this instant appeal before the court, because we do contend that this is that case. Let me stop you at that point. Let us assume for the moment that Linda B controls and that the hospital was obligated to treat this as both a medical issue and a mental health issue. They also knew her background. They knew that this was repeat behavior. They knew, basically, or should have known, that she couldn't live alone. She couldn't live. She needed care and or a watcher, just like they use. I don't think they use the word watcher. The sitter. The sitter. The sitter. Yeah, the sitter. Doesn't Linda B also require that it's your burden to show that she wasn't there voluntarily? Your Honor, the latter half of the Linda B portion of that opinion discusses the involuntariness and whose shoulders that's on to carry that. I would suggest that I would contend that portion of the opinion is largely self-contained and a remnant of that case, and here's why. When we get to Linda B, it's a pivot between the modern mental health facilities and how we look at health care and how things were done prior to that. So the respondent litigant in Linda B did not have the benefit of the eventual holding in Linda B. So they didn't know that this place was going to be considered a mental health facility. It wouldn't go in her chart and go in and say, well, if you're a mental health facility, you better comply with the admissions requirements and offer her voluntary admission or involuntary and all that. There would be some notations in the chart at that point. So the Supreme Court in Linda B, when it's talking about involuntariness and whose job is that to prove it up, is largely aimed at the facts of that case and on her in that litigant. Because going forward after the bigger holding in that case that these are mental health facilities, it's really less dramatic. We don't have to have big evidentiary hearings because we can go to this place and say, hey, I guess it's our burden, but show me her paperwork. What's the timing of Linda B versus the underlying? It's about a year, Judge, Your Honor. A year after, a year before? You're talking about Julie's case versus Linda B? Linda B was issued in late 2017. This matter arose in the fall of 2018. So by then, the hospital knew or should have known, based upon the precedent of Linda B, that they needed to follow the mental health code. Yes, Your Honor. From the beginning, rather than waiting and saying when or if she's medically discharged. Yeah, and as you point out, this wasn't some stranger off the street. This is someone they saw five days before that they knew had mental health issues. They should have immediately initiated protocols. And just to get something out of the way, this isn't a 300-page mental health intake. These requests for a voluntary admission are very lightweight. They're a page or two long. They can approach the person and say, hey, Linda, Julie, you were here a week ago. We want to continue the services. Are you comfortable signing in? If she's not comfortable, doesn't have the ability, they could have initiated, just petitioned the circuit court at that point. And when should have they done that in this case? In this case, this is an easier case, easier than Linda B. Your Honor, here's why. In Linda B, it was unclear what brought that person into the hospital. This was a suicide attempt. It was immediately, obviously, a mental health event. They should have done it within 24 hours if it was petitioned by emergency admission. But there's medical management that's going on at that time. Not necessarily so because she's ingested batteries, right? Yes, Your Honor. Causing damage to her body, and she has to have surgery, an open procedure, right? So why doesn't it stay a medical admission until that point where she's capable of being medically discharged? Well, Your Honor, that would be a dangerous road to go down because we don't return to those ages where we sequentially treat health care and we say, let's focus on the medical things and get that squared away because that could be two weeks, it could be two months, it could be ten months, and then we would pivot and make sure she gets afforded her mental health rates. I have full confidence that this hospital could walk and chew gum at the same time. They could give attention to her medical requirements and needs like that, but they could also approach her and say, are you willing to sign in and we'll start administering mental health care? And if not, they can invoke their rights and petition the circuit court at that time. Wouldn't it make sense in terms of medical management, though? Well, I guess I don't know about this kind of surgery and how quickly it has to be done to prevent damage and to address the medical emergency first, not in terms of her full recovery from it, but to address that first and then when she becomes aware of her surroundings. Let's suppose she's under anesthesia. I don't know that she had to be. A general anesthesia, that is. Wouldn't you want to wait until she came out of that and you told her we've addressed the battery issue? And I know that's not in front of us, but wouldn't you want to wait that period so that 25 hours shouldn't kick in until maybe the emergency's over or the surgery's over? No, Judge. No, Justice, at all. What you can do is immediately address the physical emergency, initiate your legal basis for holding that person. You're not holding him if it's a medical emergency, are you? It's going to count as a mental health admission still if they're administering... Because of the basis of the... And because they're talking as early as September 17th, they have mental health nurse practitioners visiting with her administering Zyprexa, psychotropic medication. And when did the surgery occur? They had one, I believe, in the record. It was one pass and one surgery was within the first week or two and then there was recovery after that. One passed and then they had... I don't want to misquote it. But where in there did they begin to deliver mental health treatment? The record indicates she came in on September 14th and they conceded as early as September 17th. They assessed her as in need of inpatient psychotropic medication. So if we were following that timeline, then it would have been on the 17th. Because otherwise they're just... Maybe it would take care of... I don't know. The only pushback I would have on that is mental health treatment is broadly defined under the code. It includes hospitalization. So if she comes in on the 14th and they're saying it's a suicide attempt... So self-harm is evidence of mental health. Correct. So if we were to agree with you and we ignored the second half of Linda B, which you've pointed out there might be a reason to do so, hospitals would have to react immediately in terms of assessing and then going for involuntary. On a case like this... But how would you do involuntary if your hearing is on the day of the surgery? So that's another misconception about how the mental health proceedings operate at the circuit court below. Continuances are liberally granted on behalf of the respondent and the respondent's counsel. So they could initiate the paperwork. When we see matters like this, they would file it. And what we would do is alert the court. They're addressing a medical condition. We'll get the records and we'll do this hearing. I'm able to talk to my client more, advise her. Maybe she wants to sign in as a voluntary at that point and have that conversation, as you alluded to, of, hey, you weren't really in the right frame of mind when you came in. You were addressing all sorts of physical stuff. We had to petition just to make sure we covered ourselves. But are you comfortable signing in at this point? And that can make that case go away as well. Well, I don't know that this is accurate in this case. But let's just say you've got an ER visit. The individual has swallowed batteries and certainly presents with a history of mental health illness and prior treatment. Are you saying at that point, when the determination is made to admit, that that triggers the 24 hours for filing a petition? The trigger would happen when they would approach the respondent at intake, go over their options. If the respondent was refusing or unwilling or combative and did not want to, and the treatment team said, well, we don't trust you if you were to leave here, that would trigger the 24 hours to file that petition. So add to the factual scenario that I described. The patient indicates, I don't want to be admitted. So that triggers it then at that point. Yes, Your Honor. Then you've got, and let's say that there isn't a continuance. Let's say nobody's asking for a continuance. And at that point, there's a determination made that the individual is not going to be admitted on an involuntary basis. You've got this medical concern that she's got batteries somewhere in her digestive tract eating a hole. Why is that a good outcome here for the individual? Well, it wouldn't be a good outcome for the individual in that respect. The hospital would be free to pursue any type of temporary or emergency guardianship to get authority to continue to treat physical conditions like that. But I always have to push back when we get questions about, is this really for that person's benefit? Why don't we want to expedite treatment? Why would we do this this way? In a lot of the terms, the attorney for the respondent just wants some annoying roadblock. And the mental health code is this big bramble bush when we put ourselves in the shoes of the doctors and the treaters and the family members. But for the individual, Justice Harris, nothing could be more important to it to make sure that their rights are protected, they have an advocate for them, and if they have autonomy, their autonomy should not be trumped unless the court adjudicates that the circumstances warrant it. And so in your situation, a circuit court judge weighed all the evidence and she was represented by counsel. There was cross-examination and evidence, and a court determined that she could self-suffine on her own. But at this point, in this case, they weren't even aware of how significant the damage was. She had passed one of the batteries, right? But another one apparently was still in the digestive tract to the point where they had to do an open procedure on her. So at the time of that hearing, nobody knows what's happening. She is literally, well, not literally, she is a ticking time bomb in terms of this battery starting to leak its contents and eroding her digestive tract. So I still don't understand how at that point it's a beneficial outcome for the respondent where you're requiring a petition be filed within 24 hours of that admission out of the ER. Here it would seem to me that you have medical management that had to take its course in order for her to have a resolution of this problem from a physical standpoint. How is that inappropriate? Well, certainly I think at the eventual hearing on that the state's attorney would make that case that we have someone subjected to a very intense physical problem going on. But at the hearing, you wouldn't know that. It could be that she's going to pass these batteries. You just don't know because here, that's all that the physicians were aware of, that she had ingested the batteries. They didn't know where they were at this point, right? Right. So if your question is what's the point or what's the urgency to getting the certificate on file sooner if we need to address this medically? Why is it appropriate to have that be the starting gun at that point as opposed to the point where she's medically stable enough to be discharged? Because these are fundamental liberty interests. She has a right to be informed of her rights if someone's keeping her there against her will. She has a right to counsel, to review things, and to offer alternative solutions and treatment options and say, I'm here, we're going to review a record, we can negotiate kind of a settlement here, get you a surgery if you want to do outpatient and kind of assist her and advise her. If you consider the alternative, she's subject to medical treatment as well as mental health treatment during that entire portion with no court oversight, no advocate on her side. She has no idea when she's leaving. She doesn't know how she's going to leave. Imagine being in that room and having no concept of time of if a court's going to have oversight or not. The benefit of the petition is not that there's going to be an eventual hearing. The benefit is maybe there won't be a hearing because there's going to be stakeholders involved now and a third party overseeing some of this. So because of the liberty interest involved, the case law is clear that we construe these statutes narrowly in favor of the respondents to make sure this is done, and continuances for them are liberally granted so people can kind of get shored up or make sure things are done. The state would be able to move to continue also. 100%. Because they could say, she's having surgery this afternoon, we're not going to have a hearing. That could be one of the things they would say. Yes. So the abundance of caution should fall on the mental health side. Always, always, Your Honor. Rather than the medical side. To give you an example, we're heading into winter. There are going to be cases where people homeless come in with frostbite. There will be four, five, six days into that admission where they're treating that person medically and they start expressing delusions or hallucinations. At that point, the treatment team says, wait a second, we have a mental health component. I would not contend that that initial emergency visit was a mental health admission. It's only until later on in the admission when it becomes clear to the treatment team, there's a mental health overlay here. We have to make sure this person is respected under the mental health code and make sure we're covered too. But what if it is apparent at the ER visit that you have this mental overlay? Then it's a mental health admission and the facility must comply with the mental health code for them to be. Always. And that doesn't mean running to court and filing a petition. Mostly it means approaching that person and saying, we're concerned about you. We would consider signing in as a voluntary recipient of services. They already had a pre-existing relationship with her. It's curious to know if they had gone to her and asked for that, whether she would have just signed herself in and all of this could have been avoided if they had been following the steps outlaid in the mental health code. And she may have acquiesced. We just don't know based on the record. Correct. That's right. What's concerning about the petition in this matter that's eventually filed and the Champaign County Public Defender's Office eventually moves to dismiss it is when you look at it, these boilerplate statewide petition forms, page one is where the petitioner asserts, what's the basis for why I want to keep this? What am I anchoring my legal basis to? There's a lot of options, a bevy of things the petitioner can choose from. The first one we see a lot is, this is an emergency. We're basing this on an emergency. That's what Carl did here. The second option is, this person was a voluntary recipient. They requested discharge, and as a reaction went out petitioning to keep them there. Carl didn't do this here. They did not allege she was voluntarily there, and now they were reacting to it. They're saying early October, oh, an emergency has sprung up. And when we look at those certificates, the certificates in early October are describing her suicide attempt and the intake back in September, which is nearly far beyond the 24-hour window here. That's what's required. What is really at issue and what's being discussed in the cases going forward for litigation in the hospitals is these nontraditional settings and when something is going to give way and rise to the level of a mental health facility. This is one of the clearer-cut cases we're going to see because her initial intake was obviously mental health-related. So the clock started, or they could have approached her to get that paperwork. And as far as burden goes, insofar there is a burden still, this public defender went above and beyond. We don't normally see transcripts in mental health proceedings that go over 50. This public defender went above and beyond. He put on five or six witnesses. Not a single witness went up there and pulled something out of the medical chart saying she was otherwise voluntarily receiving services. So to the extent there is a burden, this attorney met it here. Counsel, you said pretty much towards the beginning of your argument here that the discussion regarding the burden on involuntariness from when to be, I think you said it was largely self-contained and a remnant of that decision. Are you saying, I don't know what that means, but I think you're saying the discussion regarding the burden approving the involuntary treatment applied only to the facts of that case. Well, I think this case coexists with Linda B's holding, and we're not asking to do anything funky with that holding. I think what we would suggest is given the earlier portion of the holding, this idea that we have some kind of big, may I? The burden of kind of showing it or proving it up, these days it's a little moment because we don't have to put on these evidentiary hearings. Insofar there's a burden, maybe a respondent moves to dismiss the petition or orders for this directed finding in some way. The State Supreme Court cases, if you collect them and look at the past five or six or seven, they have it in a pattern of doing the thing where they say, Respondent, you lose in this particular case, but going forward, here is our fix. In the jury trial, we had that happen. In the written findings, we had that happen. In Linda B, I think it was more the same of the State Supreme Court. They said, Linda B, you didn't really do enough here, but going forward, this is how we're going to do things. Thank you. Thank you. Thank you, counsel. Thank you. May I have the support? Counsel? My name is James Rangel, and it's my privilege to represent the State Supreme Court. Section 3-200 of the Mental Health Code provides that a person may be admitted as an inpatient to a mental health facility for treatment of a mental illness only as provided in this chapter. So to admit a patient for mental health treatment, the facility must comply with the admission requirements of the Mental Health Code. But that does not mean that the facility must do so to provide voluntary mental health services to a patient who is already admitted for medical treatment. And if I understand Respondent's argument correctly, which I'm not entirely certain that I do, but that appears to be what he's ultimately arguing here, that even when a patient is already admitted to the facility for medical treatment, that the facility must further or otherwise admit them or comply with the Mental Health Code just to provide voluntary mental health services. Now, he claims that this case is largely resolved by Lend-A-Be, which in some respects I agree with. But he seems to suggest that that's ultimately the holding of Lend-A-Be, that even when the patient has already been admitted for medical treatment, that they nonetheless have to, I guess, further admit the patient or comply with the Mental Health Code just to provide voluntary services. Well, why doesn't it put after Lend-A-Be, that's a big notice to hospitals, i.e., if you're going to provide mental health treatment, you're a mental health provider, you qualify. You ought to follow the Mental Health Code. So, in this instance, given that they knew her history and it's self-harm, you really know from the outset you're dealing with a mental health issue. Agreed, the medical staff is going to be thinking in terms of, we've got to take care of these batteries. But why isn't it the obligation of the hospital, that is designated as a mental health provider, if they have knowledge of why the person was admitted medically and they have a familiarity with that person, and that person has a mental health history, why not ask them immediately, is it okay, are you going to accept voluntarily, because we're going to have our nurse practitioner come in and talk to you, and later the psychiatrist is going to come in and talk and assess you, at the same time we're dealing with this medical issue. And if she says yes, she can sign something, or if not, sign something, have a witness indicate that she's asserted that verbally, but has got a tremor so she can't sign something, and do both, i.e., once she says yes, we're good. If she says no, you know you're going to have to provide mental health treatment, why not file a petition then? Isn't that the real teaching of Linda B? And the homeless guy was a pretty good example in the sense that, just because somebody's homeless and they've got frostbite, does not mean that they are mentally incompetent, or in need of mental health treatment. They may be fully aware of their circumstances and say, no, there's not much wrong with me, I used to be an addict, I'm not now, my life failed, I like to live on the streets. So, comparing those two, they know this person has tried to commit suicide a couple of times. She's going to get mental health treatment one way or the other. But, I think, Your Honor, and I don't know, but I would imagine in a lot of instances where mental health treatment is administered at a medical facility, I would think that in most instances that's probably perfectly voluntary, people aren't in any way contesting it. For example, if you came in for a scheduled surgery, and maybe had been taking an antidepressant for 20 years, well, seemingly that would be a mental health service, the administration of that psychotropic drug. But it seems impractical that in every instance where you're administering what is probably in most instances perfectly voluntary mental health treatment, that you nonetheless have to comply with the code. It seems to me that one of the main questions that this Court is grappling with right now is basically what's the starting point here? And to me, it seems that when you're at a medical facility for medical reasons, and they want to administer mental health services, if those are involuntary, if you're not a voluntary recipient of those services, that seems like a good starting point. It seems like a very clear-cut, bright-line, easy-to-follow rule. You don't have to get into the nuances of, well, we know this person, we know this history, and et cetera. Because, again, in most instances, I think that most people would probably be receptive of mental health services. Because, again, as we've talked about, we're now in a world where these are kind of an integrated, holistic approach, as you mentioned, they'd like to be. So there's going to be a lot of mental health services co-mingled, if you will, with medical services, that you would have to comply and file the paperwork, provide the warnings, every time, just to simply provide voluntary mental health services. It just seems to me unreasonably onerous on the facilities. Because here, I think, really, the ultimate flaw in this case is the fact that nothing in this record, as far as I can tell, even suggests that Ms. Julie M. was an involuntary recipient of services. And that's the same problem in Linda B. And if she had simply refused these mental health services, or attempted to leave, or expressed an intent to leave, then quite reasonably, that seemingly would have triggered the filing of the petition for her involuntary commitment at an earlier point in time. But nothing in this record suggests that she did so. And I understand, I do believe that Kelsey made a pretty good point with respect to Linda B. not having the wisdom of Linda B. yet in that case. But that then seems to go down a road of assuming that mental health services are basically the presumptively involuntary. Any mental health service would presumptively be involuntary if you're requiring, as a condition of precedent, to provide any sort of service in compliance with the mental health code. So again, because I think that probably in most instances people are perfectly voluntary recipients of these services, it just seems like a very good, bright line, easy-to-follow rule that at a point in time when that becomes involuntary, when they assume the status of an involuntary recipient of mental health services, that seems like the triggering event. And that's what the hospital did here. And respectfully, it appears to state that the procedure employed by the hospital here of filing the petition for involuntary commitment at the point in time that she's being transferred or admitted for mental health services, because she's no longer there for medical services, that just seems like a proper triggering point, at the point in time when this in any way becomes involuntary. That you have to comply with the admission requirements of the mental health code as a condition of precedent to providing what may be somebody's lifelong antidepressant they've been taking. It just, practically speaking, seems unpredictable. Unless this board has any further questions. Well, what if they change your medications? She doesn't know it. Do you need to tell her? I mean, a lot of times in the hospital they don't tell patients, here are your pills, sort them by your doctor. So she's supposed to say, are they exactly the same pills that I was receiving before? Because I didn't like those. Or, yeah, go ahead and do it. That may not be very voluntary. I mean, the doctor assesses the fact that she's got the wrong medication. So he prescribes psychotropic medications. She knows she's there for medical purposes. She doesn't know she's there because they're going to change the medication that she thought maybe worked somewhat, or that is going to cause her greater, you know, she's going to be in a state of either euphoria or a state of depression. Let's forget about the admission. Once you start delivering medical or mental health services to her, isn't the hospital obligated to ask her, are you going to voluntarily accept meeting with the psychiatrist and the nurse practitioner and us changing your medication? So that changes the start date, and maybe that's not what guardianship wants, but it establishes a bright line, but it isn't necessarily a moment of admission. Because they didn't start giving her mental health treatment immediately. I think... It was three days. Three days. So, at the three days, ask her, you know, you came in because we're going to take the batteries out. You know that, we know that. We don't know why the hell you swallowed the batteries. You've done it before. You're going to be seen by the psychiatrist. No, I don't want to see him. That's pretty clear. Yeah, that's okay. He can come in. And if you want to assess my medication, yeah, okay. I mean, that's pretty clear. Why should that be... You know what? That obligation isn't on the patient. That obligation isn't on somebody that speaks for the patient because she may not have anybody there. That obligation is on the person that wants to give her the mental health treatment. I mean, you make a very good point, Your Honor. Thank you. I think it kind of starts into a medical ethical issue that I'm not perfectly versed on. But it would seem that at any point in time that you're going to administer a new medication to a patient or change their medication. I don't know, but I would have to imagine that you would have an ethical obligation to advise them. Wouldn't it be the same thing if you're going to have a psychiatrist come in and talk to her? I don't want to... You know, they ask you, do you want the pastor, the chaplain to come in and talk to you? No. You want the chaplain to come in? Yes. You ask. Perfectly reasonable. And I guess my only point is that I would imagine it would have to be an ethical obligation to advise somebody of changing their medication or having them speak to a psychiatrist, etc. And at the point in time, if that patient in any way resists that or opposes that or doesn't want to do that, that seems like a good trigger point. I don't... Again, it doesn't seem necessary that you have to comply with these admission requirements. I mean, if you look at, like, Section 3-400, for example, the facility director has to file an application indicating that the patient's suitable for voluntary admission and that the patient has the capacity to consent. And so to require that sort of paperwork for what is in probably most instances perfectly voluntary receipt of medical... mental health services, it just seems unreasonable to speak to it. Again, I think that it seems like a good starting point is if and when the person in any way resists these services, assuming they've been adequately advised of them. And that ultimately is the problem here. I don't believe that this court can reverse the trial court's ruling because the trial court found here nothing in the record suggests that this ever became involuntary. And my reading of Linda B. seems to suggest that that's a very important point, whether or not the receipt of the mental health services was voluntary or not. And there, because nothing was involuntary, nothing showed that it was an involuntary receipt of mental health services. That seemed to be ultimately the problem with Linda B. Does the court have any further questions? I see none. Thank you. Ms. Bottle? Just briefly, and thank you for your time. You're being asked to endorse the concept that someone that was under the watch of two sitters to mitigate against a person that was on an AMA hold put in there by psychiatry only magically became involuntary the moment the surgery cleared. This is the problem with not following the mental health code. We get into this subjective morass of evidentiary arguments of this social worker's note says she was kind of cooperative today, and this social worker's note says she was kind of unhappy. I don't know what more was needed for factual evidence other than her trying to escape the hospital. And this just proves the point of we need compliance with the code and the paperwork. It's a two-page piece of paper just to go approach the person and say, we'd like to give you these services. Would you like to receive them voluntarily? When they sign in, they're informed of all their rights, including the right to request discharge. I would suggest that the idea this is onerous or burdensome on the hospital, that's a heck of a lot less onerous or burdensome than an eventual lawsuit for false imprisonment or confinement to go to someone so they can hold that up and say, no, look, this person signed themselves in. We weren't, you know, unlawfully holding them here. The idea that we have to wait and see when and if they resist, and that's when we can trust we should initiate legal paperwork is inappropriate. The mental health code is not for involuntary recipients of mental health services. It's for all recipients of mental health services, whether voluntary or involuntary. And that's why we have the provisions of the code to kind of help guide us and walk us through this framework. I think if the court were to endorse the reasoning of the circuit court here and not do something about it, you're going to have a return to those Linda B. days down here where Linda B. mentioned these scatter beds in emergency rooms and hospitals where people are held for four, five, six days until a bed opens up at McFarland or OSF and then magically the petition surfaces. Linda B. said, enough. That place is a mental health facility from the get-go and you have to comply with the mental health code. Either go to them and ask them to be voluntary or get it on the circuit court's docket. You can't just time it to when it's convenient for the surgery team or the medical staff because that way it tramples all over the respondent's rights. You have to advise them in writing of their rights and ask them to come in as voluntary. Otherwise, you're going to have a return to that. The other argument I would just briefly point out is the equity argument. Someone with just a stand-alone serious mental illness going in for voluntary services would bar none be provided all this paperwork and these rights. But heaven forbid this person has a comorbid, a co-occurring condition, medical and mental health. We're suggesting that we have to wait or we can kind of drag it out before we give them those rights just because they have a physical problem or ailment. It doesn't square. And I think Linda B. resolved that and said, we don't care if you have 99 other ailments. If one of them is you're receiving mental health services or mental health treatment, we owe you certain rights and expectations under the code. And again, as I started off with, that benefits not only the respondent, it really covers some of the hospital's liability as well. If the court has no further questions on these issues. Thank you. Thank you. We'll take this matter under advisory.